UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

_____

UNITED STATES OF AMERICA,

v.                                                                            25-CR-55-RJA-MJR

JAVIER ANTONIO CRUZ,                          NOTICE OF MOTION

                 Defendant.

_____

| | |
|---|---|
| **MOTION BY:** | Fonda Dawn Kubiak, Assistant Federal Public Defender |
| **DATE, TIME & PLACE:** | Before the Honorable Michael J. Roemer, United States Magistrate Judge, Robert H. Jackson United States Courthouse, 2 Niagara Square, Buffalo, New York, **on March 27, 2025, at 10:00 AM.** |
| **SUPPORTING PAPERS:** | Affirmation of Assistant Federal Public Defender Fonda Dawn Kubiak, dated March 25, 2025 |
| **RELIEF REQUESTED:** | Suppression of Evidence. |
| **DATED:** | Buffalo, New York, March 25, 2025 |

                                                           **/s/ Fonda Dawn Kubiak**
                                                           Fonda Dawn Kubiak
                                                           Assistant Federal Public Defender
                                                           Federal Public Defender's Office
                                                           300 Pearl Street, Suite 200
                                                           Buffalo, New York 14202
                                                           (716) 551-3341, (716) 551-3346 (Fax)
                                                           fonda_kubiak@fd.org
                                                           *Counsel for Defendant, Javier Antonio Cruz*

**TO:**     Andrew J. Henning
           Assistant United States Attorney
           Western District of New York
           138 Delaware Avenue, Federal Centre
           Buffalo, New York 14202

UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF NEW YORK

UNITED STATES OF AMERICA,

v.                                                                              25-CR-55-RJA-JJM

JAVIER ANTONIO CRUZ,

                Defendant.

## DEFENDANT'S MOTION TO SUPPRESS

The defendant, **JAVIER ANTONIO CRUZ,** hereby moves for an order of suppression of the fruits of a warrantless law enforcement seizure and illegal detention of his person. Mr. Javier Antonio Cruz also seeks the suppression of any statements attributed to him by the government in response to questioning by law enforcement officers. Mr. Javier Antonio Cruz relies on his constitutional rights and protections under the Fourth, Fifth and Fourteenth Amendments for the relief requested. In addition, Mr. Javier Antonio Cruz seeks an evidentiary hearing to further develop the facts necessary to assist the Court in reaching a determination on the motion to suppress.

## STATEMENT OF RELEVANT FACTS

On or about February 18, 2025, at approximately 8:15 p.m., Patrol Officer Rosart of the North Tonawanda Police Department pulled into the Walmart parking lot located at 3939 Niagara Falls Boulevard, North Tonawanda, New York 14120. As soon as he pulled into the Walmart parking lot, he parked his marked patrol car directly behind the parked pickup truck, and he exited the vehicle. Officer Rosart was in uniform and armed as he approached a lawfully

parked white 2013 Ford pickup.  Officer Rosart approached the vehicle driven by Julio Carranza-Carlos and ordered him to provide him with identification.  When Officer Rosart approached the vehicle, he identified only three people present in the vehicle (**See Exhibit A**, "Officer Rosart's Bodycam Footage", at 0:35.  After asking for identification, Officer Rosart received no identification from the driver, and the two passengers had "Texas Client IDs" (**Exhibit A**. Bodycam at 1:08). The driver communicated with Officer Rosart, in English, that his identification was in his hotel room, and answered all his questions (**Exhibit A**, Bodycam at 0:36-1:02). Officer Rosart took an identification card from one of the passengers, and then proceeded again to have a conversation with the driver in English (**Exhibit A**, Bodycam at 1:34-2:50). The driver provided Officer Rosart with his name, date of birth, where he is from, where he is working, and his phone number. *Id*.

At the time the vehicle was stopped by Officer Rosart, Mr. Cruz was inside Walmart (**Exhibit A**, Bodycam 8:40; Cruz, Javier 213, p. 1). After Officer Rosart spoke with the three occupants of the vehicle, he went back to his vehicle and immediately searched on his laptop for the U.S. Customs and Border Protection (CBP) phone number (**Exhibit A**, Bodycam 3:10-3:36). Officer Rosart called the Buffalo, New York phone number, and spoke with Border Patrol Agent (BPA) Keiser (**Exhibit A**, Bodycam 3:47-5:46). Officer Rosart said to BPA Keiser, "I don't know if I'm reaching the right area, but I believe **I have a vehicle pulled of illegals** here in North Tonawanda in Walmart's parking lot" (**Exhibit A**, Bodycam 5:46-5:54).[1]

Officer Rosart was directed to contact the Niagara Falls station and subsequently spoke with the Niagara Falls station to report the incident (**Exhibit A**, Bodycam 8:27). Officer Rosart stated that he "pulled a vehicle over, Texas plates, pulled them over at Walmart, they dumped

---

[1] One of the supporting documents states that after Officer Rosart spoke to the three occupants of the vehicle, he contacted the U.S. Border Patrol to assist them with identifying the occupants of the vehicle and for Spanish translation (Cruz, Javier 213, p. 3).

3

two people, three of them are in the vehicle sweating pretty bad right now, so I was wondering if you guys could send somebody out and check 'em" (**Exhibit A**, Bodycam 8:36-8:48). The person at the station then asked, "you said how many, three?" to which Officer Rosart responded, "three, I'm gonna have them try and call the other two buddies out though 'cause they dipped into Walmart and they were staring at me pretty good walking in, looked a little nervous" (**Exhibit A**, Bodycam 8:57-9:05). The person at the station said he would have someone give Officer Rosart a call back (**Exhibit A**, Bodycam 9:20-9:24).

      While Officer Rosart was waiting for a call back from someone at the Niagara Falls station, he input information from the identification provided from one of the passengers (Texas Client ID) into his computer (**Exhibit A**, Bodycam 9:40-11:24). Officer Rosart then received a call back from a BPA at Niagara Falls (**Exhibit A**, Bodycam 12:39). Officer Rosart told the BPA that "we have three, I'm trying to get them to call the two that dipped out and went into Walmart. Now they're saying they don't speak any English. Got a call for a traffic complaint, followed them for a little bit. They went to Walmart, two of them dipped out real quick and they were sketchy looking at me walking into Walmart, and then they went and parked, three of 'em. One doesn't have a license, other two have Texas Client IDs" (**Exhibit A**, Bodycam 12:50-13:16).

      Officer Rosart next indicated that he would "keep them detained" until a BPA arrived, and he has his lights on still because "**technically it's a traffic stop**" (**Exhibit A**, Bodycam 13:26-13:46). After ending the phone call with a BPA at Niagara Falls, there was another officer standing in the window of Officer Rosart's car, who asked, "so what's the deal?" (**Exhibit A**, Bodycam 13:48). Officer Rosart then stated "**fuck, I was recording the phone call**" before turning off his body camera (**Exhibit A**, Bodycam 13:49-13:54).

      In the meantime, Officer Rosart commanded the driver to call Mr. Cruz and tell him that the police wanted to speak with him. Upon command, Mr. Cruz left Walmart and was detained

outside. Dkt. No. 1. At approximately 2100 hours, BPA Jason M Saleh responded to Walmart (Cruz, Javier 213, p. 3). BPA Saleh identified himself as a United States Border Patrol Agent to the occupants. BPA Saleh asked the driver, Carranza-Claros, if he had any identification on him. Carranza-Claros failed to provide any identification and was transported to the Niagara Falls Border Patrol Station. The additional subjects, Javier Cruz, Junior Garcia Castro, And David Nunez Sabillon, provided Honduran identification, and they admitted to being illegally in the United States. Dkt. No. 1. Mr. Cruz was further charged with violating Title 18 U.S.C. §§ 1326(a)(1) and 1326(b)(2).

## PRECLUSION OF EVIDENCE

Upon information and belief, a review of the Criminal Complaint Dkt. No.1, Indictment Dkt. No. , and all the material previously supplied by the United States Attorney's Office, the government intends to offer at trial physical and non-physical evidence seized by law enforcement officers from the defendant, Javier Antonio Cruz's person as a result of his seizure and search in the Walmart parking lot located at 3939 Niagara Falls Boulevard, North Tonawanda, New York.

Pursuant to Rules 16(a)(1)(A) and 16(a)(1)(E)(i) of the Federal Rules of Criminal Procedure, the United States Attorney's Office of the Western District of New York has provided discovery to the defendant including police reports, body camera footage, A-File, and any oral statement allegedly made by the defendant.

The criminal complaint in this case was signed and filed on February 21, 2025. See 25-MJ-5043, Dkt. No. 1. The government moved for detention. Mr. Cruz waived a detention hearing at that time but reserved the right to revisit if circumstances change. At that time, Mr. Cruz was remanded to the custody of the U.S. Marshal Service. Dkt. No. 6. After the initial

appearance on February 25, 2025, Mr. Cruz did not agree to a speedy trial exclusion. Therefore, the government had thirty days thereafter to present the case to the grand jury. 25-MJ-5043, Dkt. Nos. 4. During the interim, the parties engaged in voluntary discovery and counsel has an opportunity to review all the voluntary discovery provided to date. Thereafter, an Indictment was returned and arraignment is scheduled for March 27, 2025. Additional time for voluntary discovery in not necessary. Accordingly, the defendant files the instant Motion to Suppress and requests a brief deadline for the government's response and a date for a hearing.

## STANDING

The defendant has standing to move to suppress any and all tangible evidence seized during the illegal seizure of him. As set forth in detail below, the detention and subsequent arrest of Mr. Cruz was unlawful. Pursuant to the exclusionary rule all evidence seized as a result of the illegal arrest should be suppressed as fruit of the poisonous tree. *Wong Sun v. United States*, 371 U.S. 471 (1963). Defendant's Affidavit of Standing will be filed separately.

## ARGUMENT

### I.  The Initial Seizure Of Javier Antonio Cruz Was Without Articulable Suspicion and Thereafter Escalated to an Arrest Without Probable Cause

Mr.Cruz's arrest was without probable cause to believe that he committed a felony offense, nor did he commit a misdemeanor offense in the officer's presence. *Maryland v. Pringle*, 540 U.S. 366, 370 (2003). Under the Fourth Amendment, "[t]he Government bears the burden of proving, by a preponderance of the evidence, that reasonable suspicion existed for a stop." *United States v. Medina*, 301 F. Supp.2d 322, 328 (S.D.N.Y. 2004) (citing *United States v. Perea*, 986 F.2d 633, 639 (2d Cir. 1993)); see generally *Rodriguez v. United States*, 575 U.S.

348, 350 (2015) (holding that a passenger is seized in violation of the Fourth Amendment when a stop is prolonged beyond "the time needed to handle the matter for which the stop was made").

There are three types of encounters that may occur between law enforcement officers and individuals. The first type occurs when an individual agrees to speak to a law enforcement officer absent any duress or coercion. The second involves a limited detention of the individual based on a reasonable suspicion that criminal activity is underway. The third involves an arrest based on probable cause that a crime has been committed. The first type of encounter does not implicate the Fourth Amendment, while the latter two are "seizures" within the meaning of the Fourth Amendment. *United States v. Hooper*, 935 F.2d 484, 490 (1991) (citations omitted).

A seizure within the meaning of the Fourth Amendment occurs "[o]nly when the officer, by means of physical force or show of authority, has in some way restrained the liberty of a citizen...." *Terry v. Ohio*, 392 U.S. 1, 19 n. 16, 88 S.Ct. 1868, 1879 n. 16, 20 L.Ed.2d 889 (1968). The test for determining whether an individual has been restrained by coercive police conduct was set forth first in Justice Stewart's opinion in *United States v. Mendenhall*:

> [A] person has been 'seized' within the meaning of the Fourth Amendment only if, in view of all of the circumstances surrounding the incident, a reasonable person would have believed that he was not free to leave.

446 U.S. 544, 554 (1980). We adhere to the view that a person is "seized" only when, by means of physical force or a show of authority, his freedom of movement is restrained. Only when such restraint is imposed is there any foundation whatever for invoking constitutional safeguards. *Id*. Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. *Terry v. Ohio*, 392 U.S. 1, 16 (1968).

In this case, there is no question that Officer Rosart seized Javier Antonio Cruz. He commanded him out of Walmart and directed Mr. Cruz back to the car immediately. An objectively reasonable person would not feel free to leave under these circumstances. To justify

7

this intrusion, the police officer must be able to point to specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant that intrusion. *Id*. at 21 (1968). Reasonable suspicion is more than simply a hunch about possible criminality. *United States v. Sokolow*, 490 U.S. 1, 7 (1989).

No reasonable suspicion is articulable in this case. At the time of the seizure, there was no basis to order the defendants out of Walmart, into the parking lot, and back to the Ford Pickup truck. At most, Officer Rosart witnessed a Ford Pickup truck turn into an open business on Niagara Falls Boulevard and legally park in a designated parking spot. The record is unclear as to what operation of the vehicle Officer Rosart could see from the vantage point he claimed to have had and what was communicated to Officer Rosart from the anonymous traffic complaint. See **Exhibit B**, North Tonawanda Incident Report, pg. 2. Upon arrival, Officer Rosart reportedly observed Mr. Cruz and another man enter Walmart. Upon information and belief, the officer will claim to have observed the occupants were extremely nervous.

To conduct a lawful *Terry* stop of a person or vehicle, a police officer must have reasonable suspicion "to believe that the individual is 'engaged in illegal activity.' *United States v. Nunez*, 2017 U.S. Dist, LEXIS 86527, at *8 (S.D.N.Y. 2017). "Reasonable suspicion exists when there are 'specific and articulable facts which, taken together with rational inferences from those facts, reasonably warrant the intrusion on a citizen's liberty interest.'" *United States v. Lajeunesse*, 85 F.4th 679, 687 (2d Cir. 2023).[2] "A reasonable suspicion requires more than a

---

[2] *See United States v. Ramos*, 753 F. Supp. 75, 78 (W.D.N.Y. 1990) ("Agent Allman's testimony regarding his concerns about their citizenship is limited to their appearing Hispanic, according to his testimony, because they had light brown skin, and their failure to enter the terminal. This alone is insufficient to establish a reasonable suspicion adequate to justify a stop. Keeping in mind that the stop must be supported by articulable facts related to on-going, or about to be committed criminal activity, it cannot be said that having a light brown complexion, and seeking a cab on the street after arriving in a strange city, should alert anyone, even a trained and suspicious officer, that criminal activity was afoot"). The Court granted defendant's motion to suppress the evidence. *Id.* at 80.

mere 'hunch;' rather, it demands 'specific and articulable facts' and a 'particularized and objective basis' to suspect illegal conduct." *Nunez*, 2017 U.S. Dist. at *8 (citing *Terry v. Ohio*, 392 U.S. 1, 21-27 (1968)). A court assesses whether the officer had reasonable suspicion by looking at the 'totality of the circumstances.' *Nunez*, 2017 U.S. Dist. at *8. Further, "[f]or an investigatory stop to be conducted in an appropriate manner, the stop must be "limited to the degree of intrusion necessary to confirm or dispel the reasonable suspicion that justifies the stop in the first place[.]" *United States v. LeFebvre*, 117 F.4th 471, 474 (2nd Cir. 2024) (internal citations omitted).

Factors a court considers in determining the validity of a *Terry* stop include: "(1) a report of recent and serious crime; (2) furtive conduct suggesting consciousness of guilty; (3) furtive gestures; (4) nervous apprehension at the approach of police; (5) suspicious presences in a 'high crime' area; (6) proximity to the scene of a reported crime; (7) an officer's experience and specialized knowledge; (8) an officer's knowledge of a suspect's reputation; (9) information from a reliable informant; (10) resemblance to a witness's or victim's description; and (11) evasive answers to police questions." *United States v. Camacho*, 608 F. Supp. 2d 178, 182 (D. Mass. 2009), rev'd on other grounds.

Whenever a police officer accosts an individual and restrains his freedom to walk away, he has 'seized' that person. *Terry v. Ohio*, 392 U.S. 1, 16 (1968). Here, officers lacked the requisite reasonable suspicion to stop Mr. Cruz on February 18, 2025. They had no evidence that he was actively engaged in or about to engage in any criminal activity, and he had not committed any traffic violations. Mr. Cruz was not the driver or a passenger in the vehicle at the time the vehicle was stopped. In fact, he was inside Walmart and not presently affiliated with those in the vehicle.[3] Further, the complaint and supporting documents do not give rise to reasonable

---

[3] *See United States v. Dozier*, 220 A.3d 933, 947-978 (D.C. Ct. App. 2019) (finding seizure of individual, who was subjected to pat down search after uniformed armed police

9

suspicion which may validate stopping Mr. Cruz. Instead, Officer Rosart reported to CBP that Mr. Cruz was "staring at [him] pretty good walking in, looked a little nervous" and was "sketchy looking at [him] walking into Walmart" (Bodycam 8:57-9:05; 12:50-13:16).[4]

Under the totality of the circumstances, Mr. Cruz's conduct did not give rise to reasonable suspicion. Mr. Cruz did not commit any crime at the time of Officer Rosart's call to CBP, and BPA Saleh did not observe any indicia of criminality on part of Mr. Cruz. Rather, Mr. Cruz simply got out of a vehicle and walked into Walmart, and when he returned outside, he was approached by BPA Saleh seeking his identification. Looking at a police officer does not rise to furtive conduct suggesting consciousness of guilt or furtive gestures. Mr. Cruz was yet to be approached by police, so any nervous apprehension Officer Rosart reported is a mischaracterization. Instead, Mr. Cruz is a Hispanic man with a medium complexion, which does not give rise to reasonable suspicion.[5] Therefore, BPA's questioning of Mr. Cruz and request for identification was an illegal *Terry* stop.

---

officers engaged in repeated questioning and escalating requests at a time when individual was alone, at night, in a secluded alley partially blocked by a police cruiser with two additional officers standing by, was illegal under the Fourth Amendment, since there was no reasonable, articulable suspicion that individual was engaged in criminal activity prior to encounter with police).

[4] *See United States v. Brignoni-Ponce*, 422 U.S. 873, 884 (1975) ("[f]or the same reasons that the Fourth Amendment forbids stopping vehicles at random to inquire if they are carrying aliens who are illegally in the country, it also forbids stopping or detaining persons for questioning about their citizenship on less than a reasonable suspicion that they may be aliens").

[5] *See id.*; *see also* Ramos, 753 F. Supp. at 78.

Case 1:25-cr-00055-EAW-MJR   Document 12   Filed 03/25/25   Page 11 of 15

II. **The stop of Mr. Cruz was unlawful, because the stop extended beyond the reasonable time permitted for a *Terry* or vehicle stop.**

Separately, even if the officers had reasonable suspicion to justify a *Terry* or vehicle stop, the officer exceeded the reasonable time allowed for a seizure. The reasonable time permitted for a *Terry* stop is that which dispels the officer's suspicions. *LeFebvre*, 117 F.4th at 474. For a vehicle stop, the reasonable time acceptable to seize a passenger is the time needed to address the traffic infraction. *Rodriguez*, 575 U.S. at 350.

Here, Mr. Cruz was not the driver of the vehicle, nor was he in the vehicle when it was stopped. However, according to BPA Bugenhagen's report, Mr. Cruz was stopped for approximately (40) forty minutes before being transported to Niagara Falls Border Patrol Station. (Cruz, Javier 213, p. 3; North Tonawanda Incident Report). In total, the vehicle stop lasted for (1) one hour and (25) twenty-five minutes (North Tonawanda Incident Report). Even if the officer had the requisite reasonable suspicion, and even if Mr. Cruz were deemed to be a passenger of the vehicle, this amount of time offends the Fourth Amendment.[6]

III. **Mr. Cruz's extended detention was not justified to conduct further immigration inspection.**

Officer Rosart was not entitled to extend the detention to conduct further immigration inspection without at least a minimal suspicion of an immigration violation. *See Rodriguez* at 1616-17 ("the tolerable duration of police inquires . . . is determined by the seizure's 'mission'" and "when tasks tied to the [mission] are—or reasonably should have been—completed," tasks

---

[6] *See Millan-Hernandez v. Barr*, 965 F.3d 140, 147 (2nd Cir. 2020) ("[t]he documents submitted by Millan-Hernandez leave little doubt that the July 2017 stop was extended beyond what was reasonably necessary to address and resolve the immediate traffic concern: The traffic inquiry lasted a matter of minutes; the occupants of the vehicle were then detained for approximately two hours as the local officer directed the group to await the arrival of CBP agents"). The Court in *Barr* found that Millan-Hernandez provided a basis for concluding her prolonged detention was unlawful. *Id*. at 149.

11

unrelated to the mission, such as dog sniffs, are unlawful if they add time to the stop and are not otherwise supported by reasonable suspicion); *United States v. Evans*, 786 F.3d 779, 785-86 (9th Cir 2015); *United States v. Wilson*, 7 F.3d 828, 834 (9th Cir. 1993) ("a brief detention . . . beyond the time required for immigration purposes is legal if predicated on an articulable suspicion or a minimal showing or suspicion of criminal activity"); *United States v. Taylor*, 934 F.2d 218, 221 (9th Cir. 1991); *Barr*, 965 F.3d at 147 ("[a]s a general rule, it is not a crime for a removable alien to remain present in the United States' . . . [f]or that reason, 'to delay the release of some detainees for no reason other than to verify their immigration status . . . raise[s] constitutional concerns") (internal citations omitted).

Here, Officer Rosart had no reason to suspect an immigration violation in relation to Mr. Cruz. As the facts indicate above, Officer Rosart immediately contacted CBP upon return to his vehicle, to which he stated that he believed he had "a vehicle pulled of illegals" and later said there are "three" people pulled over and he was "gonna have them try and call the other two buddies out," implying a total of (5) five people (**Exhibit A**, Bodycam 3:10; 5:46-5:54; 8:57-9:05). Mr. Cruz was implicated in this transaction, yet he was not in or around the vehicle and did not present any signs of engaging in illegal behavior. Officer Rosart simply saw Mr. Cruz, a Hispanic man, entering Walmart. Outside of asking for identification from the three occupants of the vehicle, Officer Rosart took no prior actions before calling CBP, which is contrary to the proper police procedure when occupants do not present identification upon being stopped for a traffic violation.  Officer Rosart did not enter any names into his computer prior to contacting CBP, or request that anyone else do so.[7]

---

[7] *See United States v. Carpenter*, 462 F.3d 981,985 (8th Cir.2006) ("[w]e have held that when a passenger voluntarily hands identification to an officer, the officer may reasonably consider that voluntary act as consent to a brief retention of the document for purposes of a 'routine, thirty-second computerized records check, using equipment readily at hand'").

The rationale for the length of the stop is that Mr. Cruz was an occupant of the vehicle and BPA was needed for Spanish translation (Cruz, Javier 213, p. 3). However, as addressed above, Mr. Cruz was not in the vehicle at the time of the stop, and not once did Officer Rosart mention a language barrier in his two prior phone calls (Bodycam 3:47; 8:36). In fact, Officer Rosart communicated with the driver in English to gather information from him, which was more than simply identifying information (**Exhibit A**, Bodycam 0:36; 1:41). It was not until the third phone call that Officer Rosart mentioned a potential language barrier, and still never stated BPA was called for the purposes of needing a Spanish translator (Bodycam 12:50).[8] Officer Rosart's call to BPA is unjustified, and there is no plausible basis for questioning and detaining Mr. Cruz.[9]

Further, at this point Officer Rosart was yet to meet Mr. Cruz or have any reasonable suspicion of criminality on part of Mr. Cruz. Instead, Officer Rosart's stated belief of any criminality was premised on how Mr. Cruz and another individual "star[ed] at [him] pretty good . . . [and] looked a little nervous" as well as "they were sketchy looking at [him] walking into Walmart" (See **Exhibit A**, Bodycam 8:57-9:05; 12:50-13:16).[10] This is simply a hunch, which

---

[8] *See Geronimo-Dominguez v. Albion*, where "Officer Gifaldi's decision to call for assistance from a translator from the United States Border Patrol in conformance with department policy" was justified because plaintiff admitted his English was limited" (2009 U.S. Dist. LEXIS 91754, at *9 (W.D.N.Y. 2009). This is contrary to the present situation, as any indication of the potential language barrier was not prevalent until Officer Rosart's third phone call after CBP had already been requested to the scene.

[9] *See Barr*, where the officer detained passengers after determining "the car's driver had a foreign passport, [and] he did not question the driver further as to the alleged traffic violation before demanding that all of the passengers produce their papers" and the Court found there was no plausible basis for questioning and detaining the passengers. 965 F.3d at 147 (internal citations omitted).

[10] *See id.*, where there "was [no] probable cause to believe that *Millan-Hernandez* committed a crime. According to the Police Report, the local officer contacted immigration officials during the stop 'due to multiple individuals in the vehicle not having proper identification for being in the country.' The officer was detaining, he believed (perhaps correctly), '5 illegal immigrants' . . . [m]oreover, the inquiry of the passengers regarding their immigration status had no bearing on the reason for the stop and bore a questionable relationship to the local officer's likely authority . . . 'being an Hispanic migrant is not a crime'"

does not give rise to reasonable suspicion.[11]

Additionally, neither the complaint nor supporting documentation indicate that Officer Rosart asked Mr. Cruz for identification. Dkt. No. 1; (Cruz, Javier 213, p. 3). Instead, BPA Saleh is the person who asked Mr. Cruz for identification, which as discussed above, is an impermissible *Terry* stop (Cruz, Javier 213, p. 3). Neither Officer Rosart nor BPA Saleh had reasonable suspicion to stop Mr. Cruz and question him, or to detain him for purposes of conducting immigration inspection.

In summary, the initial stop of Mr. Cruz was without reasonable suspicion. Even if the government can articulate some suspicion, the length of the *Terry* stop exceeded what would be reasonable. No new facts developed between the *Terry* stop and the immediate arrest of the defendant. The significant impairment of Mr. Cruz's ability to move about freely under the orders of the agent, the retention of their personal identification and car keys, as well as the handcuffing and further orders to remain by the side of the road was without probable cause from the outset of the agent's demands. These actions combined led Mr. Cruz to reasonably believe he was not free to leave under the circumstances. The search and seizure that followed was tainted by the illegal arrest and in violation of the Fourth Amendment. As such, the fruits of that search must be suppressed.

**Conclusion**

For the reasons stated above, the defendant's motion for the suppression of tangible evidence and the exclusion of any un-noticed statements should be granted pursuant to Rule 14.1 of the Local Rules of the Western District of New York, Rule 16 of the Federal Rules of Criminal Procedure, and the Fourth Amendment.

---

[11] *Nunez*, 2017 U.S. Dist. at *8 (citing *Terry v. Ohio*, 392 U.S. 1, 21-27 (1968)).

**WHEREFORE**, for the reasons stated herein, Mr. Cruz respectfully requests this Court to grant this request and order that any and all evidence attributable to him be suppressed.

**DATED**:  Buffalo, New York, March 25, 2025.

Respectfully submitted,

**/s/ Fonda Dawn Kubiak**
Fonda Dawn Kubiak
Assistant Federal Public Defender
Federal Public Defender's Office
300 Pearl Street, Suite 200
Buffalo, New York 14202
(716) 551-3341, (716) 551-3346 (Fax)
Fonda_Kubiak@fd.org
*Counsel for Defendant Javier Antonio Cruz*

**TO:**   Andrew J. Henning
Assistant United States Attorney